# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DAVID S. TRIPLETT,             )
                                           )
       Plaintiff,              )
                                           )
     v.                      )         Case No. 4:10-CV-02225-JCH-NAB
                                           )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security    )
                                         )
       Defendant.           )

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael Astrue ("Defendant") denying the application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 - 435, filed by David S. Triplett ("Plaintiff"). [Doc. 1]. Plaintiff filed a Brief in Support of the Complaint. [Doc. 11]. Defendant filed a Brief in Support of the Answer. [Doc.12]. Plaintiff filed a Reply. [Doc. 13]. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). [Doc. 6]. For the reasons set forth below, the undersigned recommends that this matter be reversed and remanded to the Commissioner of Social Security.

## I.
## PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on June 29, 2009. His claim was denied at the initial determination level and Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 4). The ALJ held a hearing and denied the claim in a written decision dated April 22, 2010. (Tr. 31-56); (Tr. 9-18). The Appeals Council denied Plaintiff's request for review. (Tr. 1-3). As such, the decision of

the ALJ stands as the final decision of the Commissioner.

## II.
## EVIDENCE BEFORE THE ALJ

### A. Testimony at the Hearing

The ALJ held a hearing on February 22, 2010. At the hearing the ALJ heard testimony from Plaintiff, Plaintiff's wife, Vicky Lynn Triplett, and vocational expert, Brenda Young. Plaintiff was represented by counsel at the hearing.

### 1. Plaintiff's Testimony

Plaintiff testified that he is married and lives with his wife and two children, ages fifteen and seventeen. (Tr. 29). He stated that he completed the tenth grade and received his GED at least three or four years before the hearing. (Tr. 29-30). He stated that he has not had any job training or additional education since that time. (Tr. 30). Plaintiff testified that after he left high school in the tenth grade, he immediately went to work. (Tr. 35). For the last fifteen years, all his relevant work has been in the demolition and labor field, which Plaintiff said involved torch cutting, heavy lifting, climbing, going up and down stairs, asbestos, and other kinds of "dirty work." *Id*. Plaintiff testified that he did no other form of work during this period. (Tr. 36).

Plaintiff testified that during the last couple of years of his employment, he worked with good friends that knew about his back condition so they gave him the easy jobs and took up some of the slack for him. (Tr. 33-34). He said that he thinks he worked for more than one employer in 2008. (Tr. 34). Both companies were demolition companies. *Id*. Plaintiff stated that his work was assigned out of a union hall. *Id*. Plaintiff stated that he last worked from February to April 2, 2009 doing demolition work. (Tr. 31). He stated that it was just a short-term job and his back was giving out to the point where he was constantly bending over and did not have any strength from his knees down. *Id*. He stated that after April 2, 2009, he was not

2

able to work anymore. (Tr. 32). Plaintiff stated that he held no other jobs in 2009 and had trouble remembering when he last worked before February of 2009. (Tr. 33).

Plaintiff testified that he started to develop physical problems in 2000 and at first believed that it was because of his job. (Tr. 36). He stated that around this time, he began having back problems and headaches, and that he sought relief from chiropractors. *Id*. He said that he eventually went to his regular doctor, who sent him to a surgeon, Dr. Kevin Rutts ("Dr. Rutts"), in 2006. Plaintiff testified that Dr. Rutts diagnosed him with degenerative disc disease. *Id*. Plaintiff stated that he underwent surgery for degenerative disc disease on his lower back. (Tr. 36-37). He stated that titanium screws, plates, and bolts were placed in his back, where they remain. (Tr. 37). Plaintiff testified that he was out of work for nine months after his surgery and he did not undergo any physical rehabilitation. *Id*. Plaintiff stated he went back to work and soon after he started working the leg tremors that he had before his back surgery returned. (Tr. 38). Plaintiff testified that the leg tremors cause his legs to shake when he does any physical activity and that he has the tremors in both legs, especially the left. (Tr. 38-39). He stated the tremors prevent him from driving for more than thirty minutes. (Tr. 38).

Plaintiff testified that he had surgery on his neck on December 2, 2007 and he had "screws, bolts, [and] plates" put in his neck, which remained there at the time of the hearing. (Tr. 41). Plaintiff testified that the reason he had the neck surgery was because he burned four layers of his skin off his hand at work and didn't know it because of numbness. (Tr. 43). He stated that before the neck surgery, he had bad headaches and he was not able to turn his neck. *Id*. Plaintiff testified that things are "[a]bout the same" after the surgery; he still has bad headaches and sometimes when he turns his neck he gets "a really bad cold sensation[,]" which Plaintiff described as feeling like an electric shock. (Tr. 42). Plaintiff stated that he has headaches daily for an hour or two, and that the neck pain occurs one to two times a day. *Id*.

3

Plaintiff stated that he takes Tylenol PM and tries to take naps for his headaches. *Id*. Plaintiff stated that he was referred to a neurosurgeon because a doctor suspected that he might have multiple sclerosis. (Tr. 49-50).

Plaintiff stated that he has pain in both legs, but mostly in the left. (Tr. 39). There is complete numbness on the right side of his left foot and the ball of his left foot is completely numb. *Id*. The big toe on his left foot is numb and he constantly suffers cramps in the middle of his foot. Both of his butt cheeks cramp up and his calves "are always constantly cramping up." *Id*. Plaintiff testified that the problems in his back and legs prevent him from standing for more than twenty minutes. (Tr. 39-40). Plaintiff stated that for about seven years he has had numbness in his ring finger, middle finger, and index finger on his left hand. (Tr. 43). He stated this sometimes affects his ability to grip things and that the neck surgery helped a little bit with his hands, but not with the headaches. *Id*. He said that he has not tried to lift anything in the last couple of years, but he can carry a five to ten pound bag of groceries. (Tr. 43-44). Plaintiff also stated that he has "aches and pains" in his mid back on a daily basis. (Tr. 44). He testified that he is not able to bend over at his waist and touch his knees, but he could "probably" crawl on the floor but he thought that crawling would cause pain. (Tr. 45). He can stoop, but it causes pain and his balance is off so he tries not to do it. (Tr. 44-45). He uses a bar stool to help him put his shoes on or his wife helps him. (Tr. 45). He stated that he goes grocery shopping with his wife and if he has to stand in line for a long period of time he has to lean on the cart or sit down. (Tr. 40).

Plaintiff testified that his normal day consists of waking up early, cleaning out and starting his wife's car before she goes to work, and then he goes back in and drinks coffee. (Tr. 46). Plaintiff testified that he spends "a good 80 percent of the day" on the couch or laying in bed. *Id*. He tries to get up because doctors told him to be more active, but the most activity he

can do is clean the house. *Id*. He used to be able to clean the house in four hours, but now "it probably takes [him] two days." *Id*. It takes him thirty to forty minutes to clean one room, and then he has to sit down for a while. (Tr. 47). Sweeping and vacuuming hurts him, but he does it. *Id*. Plaintiff also stated that he has trouble with stairs and that sometimes his daughters will take the laundry downstairs because they are scared he will fall. (Tr. 40-41).

Plaintiff stated that he weighs between 270 and 275 pounds and is about six feet tall. *Id*. Before he started having problems with his back he weighed 220 to 230 pounds. (Tr. 45). Plaintiff attributes his weight gain to his inability to move. (Tr. 46). He testified that he used to be a power lifter and competed in meets, and that he also did martial arts but he can no longer do either activity. *Id*. He has not done martial arts since 2000. *Id*. He also stated that he has his driver's license, but his wife drove him to the hearing because he can only drive short distances. (Tr. 30). Plaintiff testified that the last time he drove was a week or two before the hearing and that he usually only drives two to three times a month, mostly to the grocery store and into town. (Tr. 30-31). He stated that he prepares meals for his family and does not do any outside work. (Tr. 50). Plaintiff stated the he no longer does activities outside of the house. (Tr. 51). He cannot go up and down a ladder and can no longer work on his mother-in-law's farm because his back went out when he picked up a fifty pound bag of feed. *Id* .

Plaintiff testified that he has had depression for a while and two months before the hearing he got a prescription for Cymbalta. (Tr. 48). He stated that he does not really leave the house anymore and he doesn't paint pictures anymore because he has no interest. (Tr. 51). He stated that he takes three Tylenol PM every night so he can sleep. (Tr. 44). The Tylenol helps him sleep a little better, however he still wakes up two to three times a night. *Id*. He takes Neurontin for nerve damage and cholesterol medicine. (Tr. 42). The Neurontin that Plaintiff takes causes him to feel nauseous, dizzy, and stay awake. (Tr. 45).

## 2. Vicky Lynn Triplett's Testimony

Vicky Lynn Triplett ("Triplett") has been married to Plaintiff since 1989 and they have two children. (Tr. 52-53). Triplett is employed full-time as a registered nurse. (Tr. 53-54). Triplett testified that as of January 1, 2009, Plaintiff was having back problems even after the two surgeries he had. (Tr. 55). She also stated that Plaintiff has visible leg tremors that were also present before the surgeries. *Id*. Triplett testified that Plaintiff has to put his feet up on a stool to tie his shoes, and that Plaintiff can't bend, sit or stand for long periods of time. *Id*. She stated that Plaintiff takes ten to fifteen Tylenol a day for headaches, but the headaches do not go away. *Id*. Triplett stated that the leg tremors occurred less frequently after Plaintiff's surgery. (Tr. 56). Triplett said that Plaintiff "tosses and turns" while sleeping at night and usually gets up at least once. (Tr. 57). Triplett stated that she and Plaintiff used to go bowling occasionally, but they don't do it anymore because Plaintiff can't tolerate going anywhere. (Tr. 58). They have tried going to neighbors' parties but Plaintiff is uncomfortable and ready to go home after twenty minutes. *Id*. Triplett testified that Plaintiff has been depressed since January of 2009. (Tr. 59).

## 3. Brenda Young Testimony (Vocational Expert)

Vocational Expert Brenda Young ("VE") testified that Plaintiff's work for the previous fifteen years as a construction worker is classified by the DOT as unskilled and up to very heavy. *Id*. The VE stated that Plaintiff operated some equipment which places his work in the semi-skilled range but still up to very heavy. (Tr. 63-64).

> The ALJ posed the following hypothetical to the VE:
> [A]ssume a hypothetical individual able to lift and carry 20 pounds occasionally, 10 pounds frequently, who could stand and/or walk for at least 2 hours total in an 8 hour work day with normal breaks, would be able to sit for a total of up to 6 hours in an 8 hour work day with the normal breaks, but would be limited to no more than occasionally climbing ladders, scaffolds, et cetera, using ramps or stairs, stooping,

kneeling, crouching or crawling. If you considered those factors, would that allow past work?

(Tr. 64). The VE testified that an individual with those limitations would not be able to perform Plaintiff's past work. *Id.* The VE testified that an individual with that RFC and with Plaintiff's vocational capabilities, including age, education, and work experience would likely be at the sedentary level based on the standing limitation. *Id.* The VE stated this would include jobs such as customer service representative, small product assembly, and telemarketing work. *Id.* At the time of the hearing there were 15,000 customer service representative jobs in the St. Louis metro area; there were 3,000 small product assembly jobs; and there were 4,500 telemarketing jobs in the area in the area. (Tr. 64-65).

The ALJ posed a second hypothetical to the VE which included the factors from the first, but with lifting and carrying limited to no more than ten pounds on an occasional basis, no climbing ladders, scaffolds, no crawling, and only rare use of ramps or stairs, stooping, kneeling or crouching or balancing. (Tr. 65). The VE testified that the same jobs would remain available. *Id.* A third hypothetical included the factors from the second hypothetical with the additional factor that the worker would have limited ability to use the fingers of the left, non-dominant hand due to lack of sensation. *Id.* The VE testified that this hypothetical would eliminate the product assembly jobs, the telemarketing jobs would remain, and the customer service jobs would be reduced to approximately 5,000. *Id.*

A fourth hypothetical included the same factors as the third but added the additional factors that "the worker would need the opportunity to change positions, sitting, standing, back to sitting at will, but not necessarily away from the work station." (Tr. 66). The VE stated that it would depend on the frequency of changing positions, but if it was more frequent than once an hour, over time, that person would not be able to maintain the jobs she identified. *Id.* A fifth

hypothetical included the same factors as the third with the additional factor that the worker

would need a break to maintain a reclining position more than one time during the work day, and

possibly up to an hour for a break. *Id.* The VE stated that this limitation would eliminate all

work. *Id.* The VE stated that her testimony was consistent with the DOT "with the exception

that the sedentary assembly jobs are all included in the DOT under the light work category," but

the VE stated that the assembly jobs do exist in the labor market at the sedentary range. *Id.*

## B. Medical Records

On October 17, 2002, Plaintiff underwent an MRI of his lumbar spine at Des Peres

Hospital. (Tr. 207). The MRI showed a narrowing of the L5-S1 disc space with paracentral disc

bulging and a mild facet joint hypertrophy, as well as disc bulging and mild facet joint

hypertrophy at the L4-5 level. *Id.* Plaintiff underwent an electromyogram and nerve conduction

study on October 25, 2002. (Tr. 206). The test gave the impression of denervation changes in

the right tibialis anterior (right side of shin) and extensor hallucis longus muscle. *Id.* The

findings supported a right L5 radiculopathy. *Id.*

On December 19, 2005, Plaintiff was experiencing chronic thoracic and lumbar pain and

was diagnosed with a herniated disc. (Tr. 213). On January 3, 2006, Plaintiff underwent a

physical to return to work. (Tr. 212). On January 20, 2006, a MRI of the cervical spine showed

degenerative changes with a small disc protrusion. (Tr. 263). On January 30, 2006, Plaintiff

underwent an MRI of his lumbar spine that showed degenerative changes with mild disc bulge

but no root impingement and stenosis. (Tr. 264). That same day, Plaintiff underwent a lumbar

discogram where the L3-4 and L 4-5 had negative findings and the L5-S1 was found to have disc

space height mildly narrowed and with some bulging posteriorly. (Tr. 253). Plaintiff reported to

doctors at Metropolitan Neurology that he had lumbar surgery in 2006 and cervical fusion surgery in 2007. (Tr. 273).

On September 25, 2007, Plaintiff underwent a lumbar myelogram where it was found that he had undergone decompression and posterior fusion. (Tr. 256). On that same day, Plaintiff underwent a CT lumbar spine post myelogram. The scan revealed the left paracentral focus of bony hypertrophic with cystic inclusion arising from the left paracentral inferior L5 endplate which causes mass effect on the anterior thecal sac and touches the left traversing nerve root at this level causing mild foraminal encroachment. (Tr. 268). On October 18, 2007, a right L5 nerve root injection was performed and Plaintiff had post-operative changes from L4 through S1 and a right S1 nerve root injection was also performed without complications. (Tr. 260).

On October 25, 2007, Plaintiff underwent a MRI of the cervical spine. (Tr. 262). The overall findings were that multilevel degenerative disc changes were observed with disc space narrowing and disc desiccation that was somewhat more pronounced at C5-6 and C6-7. *Id*. Doctors also found some straightening of the normal cervical lordosis but no worrisome marrow signal abnormality, fracture, or subluxation. *Id*. Furthermore, the cervical cord was normal in size and signal intensity, and the cerebellar tonsils were not low lying. *Id*. The MRI showed that Plaintiff had multilevel degenerative disc changes observed with disc space narrowing and dessication that was more pronounced at C5-6 and C6-7. *Id*. Plaintiff was found to have moderate right and left foraminal encroachment at C6-7 and mild right foraminal encroachment at C3-4. *Id*.

On January 15, 2008, six weeks after cervical fusion surgery, Plaintiff saw Dr. Kevin Rutz who noted that Plaintiff was progressing as expected and that he could return to work with

no lifting over 30 pounds and could return to full work duty in four weeks. (Tr. 249).On October 28, 2008, Dr. Rutz conducted a CT myelogram of Plaintiff's cervical and lumbar spine. (Tr. 240). The results showed that there was a question as to whether there was some penetration of the screws at the pedicles on the right L5 and L4 medially. *Id.* Additional cervical spine images were requested. *Id.* The CT myelogram of his cervical spine found that there was a broad based central disc protrusion and there was mild bilateral foraminal encroachment due to facet hypertrophy at C7-T1. (Tr. 248). The doctor stated that it was difficult to ascertain whether the fusion at 5-6 was solid, stating that it looked worse than 6-7. (Tr. 240). In addition, there appeared to be some bridging bone anteriorly at 6-7, but 5-6 was difficult to determine with a preliminary statement of a delayed union. (Tr. 6-7). The CT myelogram of the lumbar spine, specifically showed anterior and posterior fusion of L4-S1. (Tr. 246). It also revealed that there was significant spinal canal stenosis at the fusion site. (Tr. 247). Plaintiff was sent for a right L5 selective nerve root block and a new CT scan in six months. (Tr. 240). On November 6, 2008, Plaintiff underwent a right L5 nerve root injection. (Tr. 244). On November 20, 2008, Plaintiff underwent a right L4 nerve root block. (Tr. 243). On December 4, 2008, Plaintiff underwent a right S1 nerve root block. (Tr. 242).

On May 27, 2009, Plaintiff was examined by Dr. Richard Head for the evaluation of ataxia. (Tr. 273-274). Dr. Head reported that Plaintiff stated that he had cervical and lumbar spinal disease for which he had lumbar surgery in 2006 and cervical surgery in 2007. (Tr. 273). Dr. Head reviewed a copy of an MRI report from 2006 which showed that Plaintiff had spinal stenosis at C6-7, as well as bony changes, osteophytes and disc bulging. L4-5. *Id.* A pre-operative MRI of Plaintiff's lumbar spine showed stenosis at L4-5. *Id.* Plaintiff's major complaints to Dr. Head were symptoms of diffuse pain, tremors, leg weakness, jerking of his

legs at times, and lack of sensation in both arms and legs. *Id*. Plaintiff also told Dr. Head that he lacked sensation in his whole body and to some extent, his face. *Id*. Additionally, Plaintiff said he suffered from headaches one to three times a day that lasted a half hour to two hours at a time. *Id*. Plaintiff also stated that he had a burning pain at the top of his thighs, which was greater on the left side than the right. *Id*. Dr. Head stated that this sounded like anterior cutaneous nerve distribution. *Id*. Plaintiff also complained of poor balance, but stated he had not fallen. *Id*. Plaintiff told Dr. Head that he took Tylenol and Motrin for pain. *Id*. Plaintiff reported that he was doing heavy labor and construction work, but for the past few years his co-workers had basically filled in for him. *Id*. He stated that he had not worked since March because of poor balance and weakness. *Id*.

Motor testing performed by Dr. Head showed fairly good strength, but there was weakness in the upper and lower extremities and mild cerebellar dysfunction on heel to shin testing bilaterally. (Tr. 274). The exam also showed decreased pin sensation diffusely over Plaintiff's entire body and no sensory level at Plaintiff's neck. *Id*. Additionally, Dr. Head found mild weakness and mild cerebelar ataxis when walking and with fine motor skills. *Id*. The doctor requested an MRI and if that appears negative, a metabolic workup. *Id*. An MRI on June 1, 2009 appeared negative. (Tr. 275).

On July 30, 2009, Paul Lossman ("Lossman") completed a Physical Residual Functional Capacity Assessment of Plaintiff. (Tr. 277-283). Lossman concluded that Plaintiff could occassionally lift and or carry twenty pounds; could frequently lift and or carry ten pounds; could stand and/or walk with normal breaks at least two hours in an eight hour work day; could sit about six hours in an eight hour work day; had no limitations in pushing or pulling, other than that shown for lifting and carrying. (Tr. 278). Lossman also determined that Plaintiff could

occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could occasionally stoop, kneel, crouch, and crawl, but could frequently balance. (Tr. 279-80). He found that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 280-81)

A letter dated January 7, 2010 by Dr. John J. DuBois states that he had followed Plaintiff for cervical spine fusion, chronic lumbar back pain due to L5-S1 disc herniation, depression, and hyperlipidemia.[1] (Tr. 284). Dr. DuBois also stated that Plaintiff experienced depression due to ongoing neck and lumbar back pain. *Id.*

## III.

## ALJ DECISION

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013 and that Plaintiff had not engaged in substantial gainful activity since January 1, 2009. (Tr. 11). The ALJ determined that Plaintiff has the severe impairments of degenerative disc disease, degenerative joint disease, and peripheral neuropathy. *Id.* Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12). The ALJ concluded that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except Plaintiff cannot lift or carry more than ten pounds on an occasional basis; he can only stand or walk about two hours in an eight hour workday with normal breaks; he can sit about six hours in an eight hour work day with normal breaks; Plaintiff cannot climb ladders, ropes or scaffolds or crawl; he cannot climb ramps and stairs, or stoop, kneel, crouch, or balance on more than a rare occasion; and Plaintiff is limited to use of the first three fingers of the left

---

[1] From the period of April 1998 to October 2008, Plaintiff visited Eureka Medical for medical issues and tests. (Tr. 209-238). However, the majority of these records are difficult to read. (Tr. 209-238). Neither party substantially relies on these records in their respective briefs.

hand for feeling. *Id*.

The ALJ determined that Plaintiff is unable to perform his past relevant work but that in considering Plaintiff's age, education, work experience, and RFC there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 16). The ALJ therefore concluded that Plaintiff has not been under a disability, as defined by the Social Security Act, from January 1, 2009 through the date of the ALJ's decision. (Tr. 17).

# IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC"). *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id. See also* 20 C.F.R. § 416.920(g). At this step, the

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id. See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). The factual findings of the ALJ are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g). The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

>  (1) The findings of credibility made by the ALJ;
>
>  (2) The education, background, work history, and age of the claimant;
>
>  (3) The medical evidence given by the claimant's treating physicians;
>
>  (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
>  (5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989).  Additionally, an ALJ's decision must comply "with the relevant legal requirements."  *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them.  *Id.*  The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738. "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)). The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

## V.

## DISCUSSION

Plaintiff raises two points of error. First, Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence. Second, Plaintiff argues the ALJ erred in discrediting Plaintiff's subjective complaints. The Court will address Plaintiff's arguments in the order presented.

## 1. ALJ's RFC Determination

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence for two reasons. First, Plaintiff contends that the ALJ should have ordered a consultative exam before determining Plaintiff's RFC. Second, Plaintiff argues that the ALJ's RFC finding is flawed because the ALJ failed to include all of Plaintiff's restrictions in the RFC finding.

RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[3] SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

---

[3]A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1.

In regards to Plaintiff first contention, the ALJ has a duty to fully develop the record. *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citation omitted). In some cases, this duty requires the ALJ to obtain additional medical evidence, such as a consultative examination of the claimant, before rendering a decision. *See* 20 C.F.R. § 404,1519a(b). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citing *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986)); *see also Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) ("'[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'" (quoting *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985))). Therefore, "[a]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

Here, the ALJ concluded that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except Plaintiff cannot lift or carry more than ten pounds on an occasional basis; he can only stand or walk about two hours in an eight hour workday with normal breaks; he can sit about six hours in an eight hour work day with normal breaks; Plaintiff cannot climb ladders, ropes or scaffolds or crawl; he cannot climb ramps and stairs, or stoop, kneel, crouch, or balance on more than a rare occasion; and Plaintiff is limited to use of the first three fingers of the left hand for feeling.

Plaintiff presented medical evidence that spans from 1998 to June of 2009. However, none of the evidence from the medical sources specifically references Plaintiff's residual functional capacity or Plaintiff's ability to perform work-related activities on or after his alleged

onset date. The only medical evidence that specifically addresses Plaintiff's ability to work is a treatment note from January 15, 2008 which indicated that Plaintiff could "return to work with no lifting over 30 pounds and then regular duty in 4 weeks." However, this treatment note was one year before Plaintiff's alleged onset date; therefore, it provides no insight as to Plaintiff's ability to perform work-related activities on his alleged onset date or anytime thereafter.

There is limited medical evidence in the record after Plaintiff's alleged onset date. Those records include a June 2, 2009 treatment note, in which Dr. Head noted that motor testing showed that Plaintiff had "fairly good strength," with "mild weakness" in his upper and lower extremities. Dr. Head also noted that Plaintiff had decreased pin sensation diffusely over his entire body. However, Dr. Head offered no opinion on Plaintiff's ability to perform work-related activities on a regular and continuing basis. *See* SSR 96-8p (RFC assessment evaluates an individual's ability to do work-related activities in a work setting on a regular and continuing basis). He made no findings regarding Plaintiff's ability to lift, carry, stand, walk, or sit, all of which are functional areas in which the ALJ found that Plaintiff is limited. The only other evidence from a medical source after Claimant's alleged onset date is a letter from Dr. DuBois in which he indicated that his office had followed Plaintiff back problems, depression and hyperlipidemia. Dr. DuBois stated that Plaintiff continued to have depression due to ongoing neck and lumbar back pain. (Tr. 284). Dr. DuBois did not address Plaintiff's ability to perform work-related activities. The undersigned finds no other evidence from a medical source that relates to Plaintiff's ability to perform work-related functions on or after his alleged onset date and the ALJ cites to no medical evidence that supports the limitations he identified. *See Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (some medical evidence must support the determination of the claimant's RFC).

The Court does not overlook the fact that the record lacks any evidence that Plaintiff sought medical treatment between January 15, 2008 and October 23, 2008 and December of 2008 and May of 2009. Although failure to seek treatment may indicate the relative seriousness of a medical problem, such failure is not dispositive of the issue, and it most certainly does not establish the claimant's RFC. *See Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007) (citation omitted) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem"). Also, the Court is mindful that Plaintiff bears the burden to establish his RFC; however, an ALJ's duty to develop the record is independent of the claimant's burden to establish his RFC. *See Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (Although the ALJ has a duty to fully develop the record, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004))).

As noted above, the ALJ is required to order medical examinations and tests where the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. *McCoy*, 648 F.3d at 612 (citation omitted). Furthermore, "it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Freeman*, 208 F.3d at 692 (citation omitted). Here, Plaintiff produced medical evidence that clearly supports the impairments identified by the ALJ (degenerative disc disease, degenerative joint disease, and peripheral neuropathy). However, none of the medical evidence in the record addresses how these impairments affect Plaintiff's ability to perform work-related activities as of his alleged onset date or anytime thereafter. Nevertheless, the ALJ concluded that Plaintiff's impairments cause a number of physical limitations. However, the ALJ fails to cite to any medical evidence that supports these

limitations or his overall RFC determination.[4]  Such evidence is necessary for the ALJ to make an informed decision on Plaintiff's RFC because the RFC determination must be supported by at least some medical evidence.  *See Vossen*, 612 F.3d at 1016.

Therefore, the undersigned is of the opinion that the ALJ's RFC determination is not supported by substantial evidence.  It is recommended that on remand, the ALJ shall further develop the record by ordering a consultative physical examination of Plaintiff to determine what, if any, limitations Plaintiff has in his ability to perform work-related activities.  The ALJ shall then re-assess Plaintiff's RFC after considering the results of the consultative examination.

Plaintiff also argues that the ALJ's RFC finding is flawed because the ALJ failed to include all of Plaintiff's restrictions in the RFC finding.  Specifically, Plaintiff argues that the ALJ should have included restrictions for Plaintiff's need for alternate sitting and standing and the need for Plaintiff to take rest breaks beyond the "normal" breaks referenced in the RFC determination.  The undersigned notes that the only evidence in the record relating to these alleged restrictions is the testimony of Plaintiff and his wife.  Plaintiff cites to no medical evidence that supports these alleged restrictions.[5]  However, as discussed above, it is recommended that the ALJ reassess Plaintiff's RFC on remand after ordering a consultative examination.  The ALJ shall re-consider these alleged restrictions on remand.  If the ALJ finds medical support for these restrictions on remand, he shall include them in the RFC.

## 2.  ALJ's Credibility Determination

Plaintiff argues that the ALJ improperly discredited his subjective complaints.  Specifically, Plaintiff argues that the ALJ failed to consider his prior work record and that the

---

[4]The Administrative Record contains a Physical Residual Functional Capacity Assessment of Plaintiff completed by Paul Lossman, a lay person. (Tr. 15, 283).  A lay person is not an acceptable medical source.  *See* 20 C.F.R. § 404.1513(a)(1)-(5).  The ALJ's opinion indicates that he did not give any weight to the RFC completed by Mr. Lossman.  (Tr. 15).

[5]*See infra* for discussion of Claimant's credibility.

ALJ improperly relied on the absence of any medical opinion stating that Plaintiff is unable to work.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio*, 862 F.2d at 179; *Millbrook*, 780 F.2d at 1374. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

The Eighth Circuit has consistently held that, in assessing a claimant's credibility, the ALJ must consider the *Polaski* factors, which include: (1) claimant's daily activities; (2) the duration; frequency, and intensity of pain; (3) precipitating and aggravating factors, (4) the dosage, effectiveness, and side effects of medication; (5) functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (citing *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)). The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (citation omitted). "It is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints. *Id.* (citation omitted).

Here, the ALJ acknowledged each of the *Polaski* factors except Plaintiff's work history even though the record contains a fair amount of evidence relating to Plaintiff's work history.[6] However, though the claimant's work history is one of the *Polaski* factors, the Eighth Circuit has held that it is not reversible error for the ALJ to fail to consider the claimant's past work history

_____

[6]The relevant evidence includes Plaintiff's earnings history from 1977 through 2008 and statements from two of Plaintiff's former co-workers.

in making the credibility determination where other evidence relied on is sufficient to support the credibility determination. *Roberson v. Astrue*, 481 F.3d 1020, 1025-26 (8th Cir. 2007).

Here, the ALJ cited to a number of reasons for rejecting Plaintiff's subjective complaints. The ALJ noted that Plaintiff did not seek regular treatment for his conditions and that, at the time of the hearing, Plaintiff was not taking prescribed medication for his pain. *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (upholding ALJ's credibility determination where evidence showed the claimant did not seek regular or sustained medical treatment and took no prescribed pain medication). The ALJ also noted that no doctor opined that Claimant was unable to work. *See Raney v. Barnhart*, 396 F.3d 1007, 1011 (8th Cir. 2005) (the absence of a doctor's opinion that claimant was disabled supported the ALJ's credibility determination).

Further, the ALJ pointed to inconsistencies in the record that caused him to reject Plaintiff's complaints. The ALJ noted that Plaintiff testified that his friends "took up the slack for him" at work over the past few years, but on his Work Activity Report, Plaintiff stated that he did not have any special work conditions, including getting special help from others in doing his job. The ALJ also emphasized that Plaintiff helped to build a shed at some point after his alleged onset date and that Plaintiff's last employment ended because of a lack or work, not because Plaintiff could no longer physically do the work, as alleged by Plaintiff.[7]

---

[7]Plaintiff gave inconsistent testimony regarding why his last employment ended. He testified that the job was short-term work, that he was laid off, and that he left it voluntarily because of the physical demands of the work. *See* (Tr. 31-32).

Because of these reasons, the undersigned finds that sufficient evidence supports the ALJ's credibility determination, despite the ALJ's failure to discuss Plaintiff's work history. *See Roberson*, 481 F.3d at 1025-26. The undersigned therefore finds no error in the ALJ's credibility determination.

## VI.
## CONCLUSION

For the reasons set forth above, the Court recommends that this matter be reversed and remanded back to the Commissioner for further consideration.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint be **GRANTED IN PART** and that this matter be reversed and remanded to the Commissioner for further consideration consistent with this report. [Doc. 1]; [Doc. 11].

**IT IS FURTHER RECOMMENDED** that on remand, the ALJ order a consultative physical examination of Plaintiff and the ALJ reassess Plaintiff's RFC after obtaining the report from the consultative examination.

**IT IS FURTHER RECOMMENDED** that the Court find that substantial evidence supports the ALJ's credibility determination of Plaintiff.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this <u>10th</u> day of February, 2012.

<u>      /s/ Nannette A. Baker                </u>
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE